THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Civil File No: 2:04-CV-30-BO(1)

FEB 1 8 2005

WILLIAM DARDEN,

    Plaintiff,

v.

MARYBETH PETERS,
REGISTER OF COPYRIGHTS

    Defendant.

MEMORANDUM IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT

## I. STATEMENT OF THE CASE

Pursuant to the Administrative Procedure Act, Plaintiff William Darden brought this suit against the Copyright Office in September 2004 for Defendant's erroneous refusal to register copyright applications of MAPS FOR APPRAISERSdotCOM and APPRAISERSdotCOM.

## II. STATEMENT OF FACTS

In 1999, William Darden created APPRAISERSdotCOM, an online advertising service specifically designed to help consumers and financial institutions quickly find real estate appraisers serving any county in the USA. (AR 24, ¶ 2.) Specifically, he offers advertising on his website, www.appraisers.com. His customers are appraisers who pay periodic listing fees. (*Id.*) Mr. Darden has over 3,300 pages on his website, one for every county in the country. (*Id.* ¶ 3.) Since APPRAISERSdotCOM came online in 1999, Mr. Darden has utilized the same look and feel for his website, including a stylized map of the United States on the APPRAISERSdotCOM home page and stylized maps of individual states on the pages for their respective states.

Mr. Darden hired Sean Pecor, a professional web designer, to create the APPRAISERSdotCOM maps in late 1997 through early 1998. (AR 47, ¶ 3.) Mr. Pecor spent

120 hours creating the stylized maps. (*Id.*) He began with digital maps from the United States Census. (*Id.*) He resized the maps and redrew lines. (*Id.*) Specifically, he redrew the "anti-aliased" lines. (*Id.*) "An anti-aliased line is a line digitally softened by a graphic program to render a line more smoothly. If you don't redraw the lines during a scale down of an image, you get a 'chunky' look." (*Id.*) Mr. Pecor then decided to give the redrawn maps a three-dimensional effect by selecting and shading certain portions of the outlines. (*Id.*) He accomplished this by manually drawing new lines next to the part of the outline he selected for shading. (*Id.*) Mr. Pecor chose and applied the colors and fonts throughout the maps. (*Id.*) He also created labeling and call-outs and selected what to label and call-out. (*Id.*) Mr. Pecor assigned all of his copyrights in the maps and the website design to Mr. Darden in 1999. (*Id.* ¶ 4.)

Over the years, consumers have frequently requested permission to use the maps of APPRAISERSdotCOM. (AR 25, ¶ 4.) People recognize the maps as being unique and distinctive. (*See id.* ¶¶ 4-7.) Another website advertising appraisers in the United States, one of Mr. Darden's competitors, copied Mr. Darden's maps. (*Id.* ¶ 5.) Mr. Darden's customers notified him of the competing website, incensed because they thought the other website was also owned by Mr. Darden since it displayed his maps. (*Id.*) The customers immediately recognized Mr. Darden's maps on another's website.

Desiring to register his copyrightable maps and web page design, Mr. Darden submitted two applications for copyrights, which the Copyright Office received on May 17, 2002. (AR 55-273.) One application is his website, titled "APPRAISERSdotCOM." (AR 55-214.) Mr. Darden submitted this application as a "technical drawing," to which the author added "graphics, text, colors, and arrangement." (AR 55.) The second application is for the maps displayed on

his website, "Maps for APPRAISERSdotCOM." (AR 215-273.) Mr. Darden indicated that the "nature of authorship" was a map. (AR 215.) He also explained that the maps were based on US Census maps and the material added to the original work included "font and color selection; visual effects such as relief, shadowing, and shading; labeling; call-outs." (AR 215.)

The Copyright Office denied registration of the two works on May 30, 2002. (AR 50-52.) The Office claimed the application of Maps for APPRAISERSdotCOM was not copyrightable because the maps lacked the authorship necessary to support a copyright claim. (AR 50.) It asserted, "The 'visual effects such as relief, shadowing, and shading' refer to elements which are standard and are likely only a simple product of the computer software used. The 'labeling' also appears to be standard." (AR 50.) The Office did not produce any evidence in support of its claims that the designs were "standard."

With regard to APPRAISERSdotCOM, the Office found the deposit material did not support the claim for a "technical drawing." It suggested that the website's text and data compilation might be protectible, but that Mr. Darden could not claim format, layout, or page design. (AR 51.)

On August 8, 2002, Mr. Darden amended his APPRAISERSdotCOM application for protection as a "compilation and arrangement of maps, text, graphics, and data" in response to the Copyright Office's recognition that the web pages could constitute an original compilation. (AR 40; *see* AR 51.) Mr. Darden described the material added, "Text; map designs and formats; compilation, formatting, and arrangement of text, maps, graphics, and listing data. No claim is made to the content of the listing data." (AR 40.)

On August 21, 2002, Mr. Darden appealed the Copyright Office's denial. (AR 32-35, 47.) With regard to Maps for APPRAISERSdotCOM, Mr. Darden's counsel explained,

> The "creative spark" that makes Mr. Darden's maps eligible for protection are the overall design – the special combination of font and color selection; visual effects such as relief, shadowing, and shading; labeling; and call-outs. The information the map provide could easily be provided in other ways; thus, the author should be allowed to protect his creative efforts.

(AR 33.) Mr. Darden submitted the declaration of Sean Pecor, the author of the maps, to explain his creative efforts in authoring the stylized maps. (AR 47.) Mr. Darden also offered further clarification of his amended application for APPRAISERSdotCOM. (AR 34-35.) He explained that a compilation may consist of only the selection and arrangement of pre-existing material, which is what Mr. Darden and Mr. Pecor did in creating APPRAISERSdotCOM. (*Id.*)

The Copyright Office again refused to register Mr. Darden's works on November 29, 2002. (AR 27.) The Office wrote, "The changes made to the maps in these works amount to little more than layout or format, which as previously stated, are not copyrightable." (AR 29.) Regarding the APPRAISERSdotCOM application, the Office suggested that a claim only for "text and compilation of data" would be permissible. (AR 31.) Specifically, the Office concluded that the changes made to both works, "including the font and color selection, the visual effects such as the relief, shadowing, shading and coloring, and the manner in which the labeling, call-outs, maps, text, graphics and listing data ... to be in the nature of *layout and format*, and therefore, not copyrightable." (AR 28 (emphasis in original).)

The Office cited three cases in which maps were found to be copyrightable: *Mason v. Montgomery Data, Inc.*, 967 F.2d 135 (5th Cir. 1992); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739 (2nd Cir. 1998); *Albert Sparaco v. Lawler, Matusky, Skelly Engineers LLP*, 60 F. Supp. 2d 247 (S.D.N.Y. 1999). (AR 29-30.) The Office asserted the maps in these cases were distinguishable from Mr. Darden's maps because "each case focused on the overall manner in which the expressive elements in each map were selected, coordinated, and arranged, and

concluded that each map contained sufficient creativity in both the selection, coordination, and arrangement of facts they depicted as well as the pictorial and graphic nature of the way that these facts are expressed." (AR 30.) The Office refused to apply the same standard for reviewing a map's overall design, but instead separately focused on visual effects and the labeling and call-outs. (AR 30.) With regard to the APPRAISERSdotCOM application, the Office wrote, "[W]e can offer a claim in only the 'text and compilation of data'." (AR 31.)

Through counsel, Mr. Darden requested reconsideration in a letter dated April 30, 2003. (AR 19-23.) Mr. Darden clarified that the Copyright Office must look to the design of the maps as a whole and not focus on isolated elements. (AR 20.) Mr. Darden also explained that the maps are copyrightable since the information they provide could be provided in other ways. (*Id.*) In an accompanying declaration, Mr. Darden explained that other people recognize the distinctiveness of his stylized maps. (AR 22, 24-25.) Mr. Darden disagreed with the Copyright Office's reliance on *Mason* and *Streetwise* in that Mr. Pecor "went far beyond compiling and arranging pre-existing factual information onto pre-existing maps. ... Applicant authored creative artistic expressions for each map[,]" including color as an expressive element. (AR 22-23.)

On July 7, 2004, the Copyright Office denied Mr. Darden's second appeal. (AR 1-12.) The Office began by addressing the creative elements of the stylized maps separately. First, the Office noted, "Using the color blue in connection with a map is not creative, nor is the shading created on the boundaries of the regions." (AR 7.) The Office continued, "The lettering and placement of the names is 'garden variety' and generally centered within each region. The fact that call-outs are used appears to be dictated by necessity and functionality rather than by creativity, but ... they are standard shapes and features that are uncopyrightable." (*Id.*) The

Office summarized, "None of these individual features display the requisite level of creativity to support a copyright claim." (*Id.*) Finally, the Office acknowledged that copyrightability must be determined by looking at a work as a whole. (AR 8.) The Office merely concluded, "The arrangement of the names, call-outs, shading, and color is 'entirely typical' and does not establish a basis for establishing the requisite level of creative authorship necessary to sustain a copyright in a map or any other work." (*Id.*) Still, the Office did not provide any illustrations or evidence to demonstrate why it determined that Mr. Darden's stylized maps were "entirely typical." The Office affirmed its earlier rejection of Mr. Darden's APPRAISERSdotCOM as well. (AR 9.) It explained that the arrangement of the maps "is not even minimally creative." (*Id.*) Further, it again asserted that copyright does not protect format or layout and that "protection of the overall format of a web page is inconsistent with copyrightability." (AR 10.) The Office found "that specific textual, and perhaps also, graphic or pictorial matter within the web pages may have been selected, coordinated and arranged in such a way that a claim of copyright may be sustained for such a compilation, but this would entail submission of a new application limiting the scope of the claim accordingly." (AR 11.)

### III. ARGUMENT

#### A. Standard for Review

Pursuant to 17 U.S.C. § 701, "all actions taken by the Register of Copyrights under [the Copyright Act] are subject to the provisions of the Administrative Procedure Act ...." Under the Administrative Procedure Act, "[a] person suffering a legal wrong because of an agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

In reviewing an agency's construction of a statute which it administers, the first question

is always "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 833 (1984). Congress unambiguously set forth the requirements for what is copyrightable in the Copyright Act. 17 U.S.C. §§ 101-03. Specifically, Congress allowed that maps and compilations are within the subject matter of copyright, 17 U.S.C. § 101, so long as they are "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102. Because Congress has made its intent with regard to copyrightability clear, "the court ... must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

Copyrightability is a question of law. *Collezione Europa U.S.A., Inc. v. Hillsdale House, Ltd.*, 243 F. Supp. 2d 444, 452 (M.D.N.C. 2003); *Pivot Point Int'l, Inc. v. Charlene Prod., Inc.*, 932 F. Supp. 220, 225 (N.D. Ill. 1996) (Easterbrook, J., sitting by designation). It is well settled that questions of law receive de novo review. *DeLoach v. Lorillard Tobacco Co.*, 391 F.3d 551, 562 (4th Cir. 2004).

## B. Standards for Copyrightability

Copyright protects works of authorship, *i.e.*, creative expressions, from being copied or used without the author's consent. *See* 17 U.S.C. §§ 102, 106. The Supreme Court clarified the standard for authorship in *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340, 345-46 (1991) (emphasis added):

> Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01 [A], [B] (1990) (hereinafter Nimmer). To be sure, *the requisite level of creativity is extremely low; even a slight amount will suffice.* The vast majority of works make the grade quite easily, as they possess some

7

creative spark, "no matter how crude, humble or obvious" it might be. *Id.*, § 1.08 [C][1]. *Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.* To illustrate, assume that two poets, each ignorant of the other, compose identical poems. Neither work is novel, yet both are original and, hence, copyrightable. See: *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (CA2 1936).

Additionally, "[t]he copyright laws ... allow people to collect the reward for their contributions. If the incremental contribution is small, so too is the reward, but *a subjective assessment of the importance of the contribution has nothing to do with the existence of a copyright.*" *Rockford Map Publishers, Inc. v. Directory Service Co. of Colorado, Inc.*, 768 F.2d 145, 148 (7th Cir. 1985) (emphasis added).

### 1. Standards for Maps

The Copyright Office must look at a submitted work as a whole. *See Knitwaves, Inc., v. Lollytogs Ltd.*, 71 F.3d 996 (2nd Cir. 1995) (holding sweater design as a whole was entitled to copyright protection); *Novelty Textile Mills, Inc., v. Joan Fabrics Corp.*, 558 F.2d 1090 (2nd Cir. 1977) (holding fabric design as a whole was protectible). A growing number of courts "have recognized that maps, unlike telephone directories and other factual compilations, have an inherent pictorial or photographic nature that merits copyright protection." *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 142 (5th Cir. 1992).

In *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739 (2nd Cir. 1998) (finding copyright of map to be valid), the Second Circuit corrected the trial court's holding that color selection for identifying features in a map was not protectible. The appellate court focused on the overall manner in which the author selected, coordinated and arranged expressive elements. The Second Circuit specifically held that color was one of the expressive elements. *See id.* at 748.

## 2. Standards for Compilations

Section 103(a) of the Copyright Act allows that the subject matter of copyright includes compilations.

> A "compilation" results from a process of selecting, bringing together, organizing, and arranging previously existing materials of all kinds, regardless of whether the individual items in the material have been or ever could have been subject to copyright.

Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 3.02 (quoting House Report page 57). A compilation may consist merely of the selection and arrangement of pre-existing material without any internal changes in such material, such as a catalog. *Id.*

> A compilation of non-protectible facts is copyrightable if it "features an original selection or arrangement of facts," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), so that the selection or arrangement "possesses at least some minimal degree of creativity," *id.* at 345, 111 S.Ct. 1282.

*MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 193 (2nd Cir. 2004).

In order to be copyrightable, a compilation must meet the requirements of 17 U.S.C. § 102(a): it must be (1) an original work of authorship (2) fixed in any tangible medium of expression from which it (3) can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device, and (4) it may not be an idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in a work.

> Originality in the copyright sense means only that the work owes its origin to the author, i.e., is independently created, and not copied from other works. Therefore, a work is original and may command copyright protection, even if it is completely identical with the prior work, provided it was not copied from such prior work but is rather a product of the independent efforts of its author.

Nimmer § 2.01[A]. "The contribution of a collection of facts lies in their presentation, not in the facts themselves. The collector may change the form of information and so make it more

accessible, or he may change the organization and so make the data more understandable." *Rockford Map Publishers, Inc. v. Directory Service Co. of Colorado, Inc.*, 768 F.2d at 148.

C.  **Copyright Registration for "Maps for APPRAISERSdotCOM"**

Mr. Darden seeks a copyright in the stylized maps, Maps for APPRAISERSdotCOM. (*See* AR 215-73.) The overall design, including the color selection, visual effects, etc., provide the "creative spark" that make the stylized maps original and eligible for protection. The sworn declaration of Sean Pecor clarifies the original and creative contributions he made to the stylized maps. (AR 47.)

While Mr. Pecor used outline maps from the U.S. Census as a starting point, Mr. Darden does not claim copyrights in the original outlines. (*Id.*) In post-processing, Mr. Pecor altered each map to such a degree that he measurably changed each line on each map from the digital originals he obtained from the U.S. Census. (*Id.*) Mr. Pecor also resized the maps and redrew many of the anti-aliased lines, which are further acts of original authorship. (*Id.*) In choosing to anti-alias the redrawn lines, Mr. Pecor added more color to the lines to smooth edges for purposes of giving a softer appearance. (*Id.*)

Mr. Pecor also manually authored a three-dimensional shadowed effect on every map by repeating each outline several times – one bright blue outline slightly askew, one darker outline slightly askew, etc. (*Id.*) Further, Mr. Pecor uniquely shadowed each map. (*Id.*) Reviewing the deposit material shows that Mr. Pecor did not automatically or mechanically shadow the maps. (*See* AR 216-73.) To the contrary, each map is shadowed differently, to highlight the unique shape and attribute of each particular state or set of counties. (*See id.*) For example, the southern and western portions of the State of Alaska are outlined, which enhances and highlights the Alaskan peninsulas and Aleutian Islands. (AR 218.) In contrast, the author highlighted the

northwest and southwest corners as well as limited coastal areas for the State of California. (AR 221.) Each state has been uniquely shadowed to create a unique three-dimensional expression. The drafting of these three-dimensional effects and the color selection of these effects are acts of original authorship.

A review of the deposit material further illustrates that the author chose the manner in which the names of states and counties were expressed. (*See* AR 216-73.) The author labeled, numbered or called out only certain counties on the state maps. (*See id.*) This selection and identification of counties can only be described as unique and original. For example, the author called out fifteen counties in the State of Alaska, placing them with yellow-green dots and black call-out boxes. (AR 218.) With regard to the State of California, the author called out three counties. (AR 221.) The author called out ten counties for the State of Florida, four for the State of Hawaii, two from the State of Kansas, and none for the State of Ohio. (AR 225, 227, 232, 251.) The author called out numerous counties for the State of New York and called out and placed the counties of Leelanau and Keweenaw for Michigan. (AR 247, 238.) For the State of North Carolina, Mr. Pecor numbered twelve counties and set the names out to the side. (AR 249.)

Mr. Pecor also selected unique and original map colors and fonts. In creating the labeling and call-outs, he chose to contrast the bright blue of the maps with a flat midnight black of the call-outs. Color selection is considered an expressive, and thus protectible, element in maps. *See Streetwise Maps*, 159 F.3d at 748.

Even third parties recognize and corroborate the unique and original attributes of Mr. Darden's stylized maps. Third parties have contacted APPRAISERSdotCOM to inquire whether they could license the stylized maps for use on their own websites. (AR 25.) Such requests to

license presume unique and creative attributes. Further, upon investigation, Mr. Darden has discovered numerous third parties using his maps on their website. (*Id.*) Mr. Darden typically discovers such use from customers of Appraisers.com who report finding Mr. Darden's maps on other websites. (*Id.*) When customers see Mr. Darden's stylized maps on third party websites, they incorrectly assume that Mr. Darden owns the third party website. (*Id.*) Such customers complain because they believe Mr. Darden is running parallel websites without listing them on such websites. (*Id.*) Their assumption is premised in their belief that the stylized maps are a distinctive expression of Mr. Darden.

The Copyright Office refused registration for Mr. Darden's maps, claiming the original material added is "entirely typical" and thus lacks sufficient authorship to support a copyright. (AR 8.) However, the Office failed to produce even one illustration of exactly why the maps are typical. (*See* AR 1-273.) Regardless, "[o]riginality does not signify novelty ...." *Feist*, 499 U.S. at 345.

Mr. Darden does not seek a copyright on one particular design element of the stylized maps in question, nor does he ask for protection of "simple combinations" of elements such as "familiar shapes, symbols, and designs; mere variations of typographic ornamentation, lettering, fonts or coloring." (AR 50.) Collectively, Mr. Pecor's actions appreciably altered the maps from their original form. Mr. Pecor contributed significant creative expression to these stylized maps, making them unique and distinctive. As set forth above, "the requisite level of creativity is *extremely* low; even a slight amount will suffice. The vast majority of works made the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Feist*, 499 U.S. at 345. These stylized maps "possess sufficient creativity in both the

selection coordination, and arrangement of the facts that they depict, and as in the pictorial, graphic nature of the way they do so ...." *Mason*, 159 F.3d at 142.

### D. Copyright Registration for APPRAISERSdotCOM

The compilation and arrangement of the maps, text, graphics and data entitled APPRAISERSdotCOM constitutes an original work of authorship. "[A] compilation consists *merely* of the selection and arrangement of pre-existing material without any internal changes in such material ...." Nimmer § 3.02. Thus, the originality requirement for a compilation of facts to be entitled to copyright protection is not stringent and "requires only that the author make the selection or arrangement independently (*i.e.*, without copying that selection or arrangement from another work), and that it display some minimal level of creativity." *Feist*, 499 U.S. 340, 358 (1991).

It is uncontroverted that the authors for this application, Mr. Pecor and Mr. Darden, independently compiled, formatted, and arranged the text, maps, graphics, and listing data that comprise the deposit material. Even the Copyright Office acknowledges this fact. (AR 11.) Thus, copyright protection for this arrangement and selection is appropriate.

### IV. CONCLUSION

For the reasons set forth above, Plaintiff William Darden respectfully requests the Court grant summary judgment in his favor, finding that his "Maps for APPRAISERSdotCOM" and "APPRAISERSdotCOM" works are copyrightable as a matter of law.

Respectfully submitted this the 18th day of February, 2005.

                                     **Coats & Bennett, P.L.L.C.**
                                     **Attorneys for Plaintiff**

By: _/s/ Anthony J. Biller_____
      Anthony J. Biller
      North Carolina State Bar No. 24,117
      David E. Bennett
      North Carolina State Bar No. 12,864
      Rebecca E. Crandall
      North Carolina State Bar No. 32,637
      1400 Crescent Green, Suite 300
      Cary, North Carolina 27511
      Telephone No.: (919) 854-1844
      Facsimile No.: (919) 854-2084

## CERTIFICATE OF SERVICE

I certify that the foregoing **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** is being served this 18th day of February, 2005 via United States First Class Mail, postage prepaid, addressed as follows:

> Lora M. Taylor
> Assistant United States Attorney
> Civil Division
> 310 New Bern Avenue
> Suite 800, Federal Building
> Raleigh, NC 27601-1461
>
> John Fargo
> Director, Commercial Litigation Branch
> Civil Division
> Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

By: /s/ Rebecca E. Crandall
Rebecca E. Crandall
Attorney for Plaintiff